UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

FREE LIBERTARIAN PARTY, INC., a New York not-
for-profit corporation doing business as the Libertarian
party of New York and acting as an independent body
under the name of the Libertarian Party; and WILLIAM
REDPATH, a Virginia resident.

                               Plaintiffs,

               -against-

ANDREW J. SPANO, GREGORY P. PETERSON,
PETER S. KOSINSKI, and DOUGLAS A. KELLNER,
in their official capacities as Commissioners of the New
York State Board of Elections,

                             Defendants.

------------------------------------------------------------------- x

**MEMORANDUM &
ORDER**
16-CV-3054 (SMG)

GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

      This case arises out of the 2016 election cycle in the State of New York.  Plaintiffs

contend that their First Amendment rights were and continue to be violated by a New York

Election Law that provides that only persons who are "duly qualified voter[s] of the State of New

York" may witness signatures on nominating petitions.  N.Y. Elec. Law § 6-140(1)(b).

      Plaintiffs assert their First Amendment challenge pursuant to 42 U.S.C. § 1983 and

against defendants Andrew J. Spano, Gregory P. Peterson, Peter S. Kosinski, and Douglas A.

Kellner (together "Defendants") in their official capacities as Commissioners of the New York

State Board of Elections ("the Board" or "the State").  Amended Complaint ("Compl.") ¶¶ 2, 7-

10, Docket Entry 45.  Plaintiffs seek a judgment declaring Section 6-140(1)(b) unconstitutional

and an injunction preventing defendants from enforcing it.  *Id.* at 11.

The parties have cross-moved for summary judgment. For the reasons stated below, plaintiffs' motion is granted and defendants' motion is denied.

**FACTUAL BACKGROUND**

*A. The Parties*

Plaintiff Free Libertarian Party, Inc., d/b/a the Libertarian Party of New York ("LPNY"), is the recognized New York affiliate of the national Libertarian Party. *Id.* ¶¶ 1, 5. It has run candidates for statewide office every two years since 1974 except 1986. *Id.*

Plaintiff William Redpath ("Redpath") is a Virginia resident and a member-at-large of the national committee of the Libertarian Party. *Id.* ¶ 6. As a resident of Virginia, Redpath is not registered to vote in New York. Defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1") ¶ 6, Docket Entry 37.[1] During the 2016 election cycle, Redpath counseled LPNY. *Id.* ¶ 8. During that same cycle, Redpath circulated nominating petitions in several states, but not in New York, as he was not asked to do so. *Id.* ¶¶ 9-10. Redpath has circulated petitions in New York in the past and would have again in 2016 had his assistance been requested. *Id.* ¶ 10. When Redpath did circulate petitions on behalf of LPNY in New York, he could not witness the petition signatures; the signatures were instead witnessed by someone else working alongside him. Deposition of William Redpath ("Redpath Dep.") 34:13-19, Docket Entry 38-1. The last time plaintiff Redpath circulated a petition in New York was in 1994. *Id.* 34:10-12.

Defendants are Commissioners of the New York State Board of Elections ("NYSBOE"), named in their official capacities. Compl. ¶¶ 7-10. NYSBOE is responsible for enforcing the State's election laws, including Section 6-140(1)(b). *Id.* ¶ 7.

---

[1] Plaintiffs do not dispute the facts asserted in Defs.' 56.1 for the purposes of the pending cross-motions. Plaintiffs' Response to Defendants' Statement of Undisputed Facts ¶¶ 6-10, 19, Docket Entry 42-2.

*B. The Challenged Provision: The Witness-Residency Requirement*

New York election law defines an "independent body" as an organization or a group of voters that seeks to nominate candidates for office but has not attained "party status." N.Y. Elec. Law § 1-104(12). A political organization attains party status when it has "polled at least 50,000 votes for its candidate for governor" in the previous election. *Id.* § 1-104(3). LPNY is an independent body. Defs.' 56.1 ¶ 19; Compl. ¶ 23.

Independent bodies must follow a number of specific rules to place candidates on the ballot for an election. Among those rules is a state law requiring independent bodies to obtain a certain number of signatures of duly registered voters for each elected position. For example, 15,000 valid signatures are required for state-wide positions, and 7500 are required for New York City-wide positions. N.Y. Elec. Law § 6-142(1), (2)(b). A duly registered voter must be a resident of New York State. *Id.* § 5-102(1).

An independent body gathers signatures by circulating a nominating petition for a particular office. *Id.* § 6-138(1). The statute challenged here provides that only signatures witnessed by another "duly qualified voter of the state" are valid.[2] *Id.* § 6-140(1)(b) ("the witness-residency requirement").[3] Because witnesses must be "duly registered voters," residents of other states, such as Redpath, may not witness nominating petition signatures. Non-residents

---

[2] Section 6-140(2) provides that a notary public or commissioner of deeds may witness petition signatures in lieu of a duly registered voter. N.Y. Elec. Law § 6-140(2). This provision is not at issue in this case. Notaries and commissioners of deeds must either be New York State residents or have an office or place of business within the State. N.Y. Exec. Law §§ 130(1), 139(3), 140.

[3] Although the challenged provision limits those who may witness signatures to registered voters, this Memorandum and Order refers to the limitation as the "witness-residency requirement" because, as discussed below, the statute would be unconstitutional even if it limited those who could witness signatures to New York State residents regardless of whether or not they were duly registered voters.

may, however, circulate petitions alongside duly registered voters, and those registered voters may serve as the witnesses to the petition signatures.

Plaintiff LPNY seeks to use nonresidents to circulate nominating petitions on behalf of its candidates, and Redpath seeks to serve in that capacity. Compl. ¶¶ 15-16, 25-34. Plaintiffs therefore challenge the requirement that a witness be a "duly qualified" voter, and thus a resident of New York State, as unconstitutionally burdening their First Amendment rights.

## PROCEDURAL HISTORY

Plaintiffs moved for summary judgment on September 11, 2017. Defendants responded with a cross-motion for summary judgment on October 20, 2017. Docket Entries 35-36.

I first heard argument on the pending motions on December 13, 2017. *See* Minute Entry dated December 13, 2017. Questions arose during that argument about whether Marc Glogowski, the Chair of LPNY, was properly named as a plaintiff in the original complaint. Transcript of Motion Hearing Held on December 13, 2017 ("Dec. 13 Hr.") at 3:12-15; 29:9-18, Docket Entry 48. Plaintiffs were then granted leave to file an amended complaint. Dec. 13 Hr. at 37:21-23. An Amended Complaint naming LPNY as a plaintiff in lieu of Glogowski was filed on December 20, 2017, and defendants answered the new pleading on January 26, 2018. *See* Compl.; Answer, Docket Entry 51. On December 20, 2017, the parties consented to reassignment of this action to me for all purposes.[4] Consent, Docket Entry 49. The parties then submitted additional briefing taking into account the entry of LPNY as a plaintiff in the action. Docket Entries 52-56. I heard argument on the parties' cross-motions for a second time on March 29, 2018. Transcript of Civil Cause for Oral Argument ("Tr."), Docket Entry 58.

---

[4] The parties had previously consented on June 12, 2017. Docket Entry 30. Because of the substitution of LPNY into the case, however, a new consent form was executed. *See* Dec. 13 Hr. at 43-44. The Clerk shall amend the caption to reflect the substitution.

A.  *Summary Judgment*

A court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute concerns a material fact if its resolution "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  The movant may demonstrate that summary judgment is appropriate by showing that no reasonable jury could find for the nonmoving party based on the evidence offered in support of the claim.  *See Powell v. Nat'l Bd. of Med. Exam'rs.*, 364 F.3d 79, 84 (2d Cir. 2004) ("[T]he existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant." (citing *Anderson*, 477 U.S. at 252)).

B.  *Standing*

Before considering the merits of a case, a court must first determine that it has subject matter jurisdiction over plaintiffs' claims.  *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (noting that a court "may not assume jurisdiction for the purpose of deciding the merits of the case" and that "jurisdictional questions ordinarily must precede merits determinations"); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 141 n.6 (2d Cir. 2000) (same).  Article III of the Constitution limits the judicial power of the

federal courts to the adjudication of "cases" and "controversies." U.S. Const. art. III, § 2. "One element of the case-or-controversy requirement" is that plaintiffs must have standing to sue. *Raines v. Byrd*, 521 U.S. 811, 817 (1997). The doctrine of standing "serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Defendants argue that jurisdiction is lacking here because neither Redpath nor LPNY have standing to challenge the witness-residency requirement. Defendants' Supplemental Memorandum in Support ("Defs.' Supp.") at 4-7, Docket Entry 52.

Plaintiffs bear the burden of establishing standing for each form of relief they seek. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016); *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012). This burden increases as a litigation proceeds; that is, "each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Credico v. N.Y. State Bd. of Elections*, 2013 WL 3990784, at *7 (E.D.N.Y. Aug. 5, 2013) (quoting *Cacchillo v. Insmed Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)). Thus, at the summary judgment stage, a plaintiff "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of [a] summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted).

To establish standing, "(1) the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Nat'l Org. for Marriage,*

*Inc. v. Walsh* (*NOM*), 714 F.3d 682, 688 (2d Cir. 2013) (quoting *Lujan*, 504 U.S. at 560-61) (internal quotation marks omitted). "To obtain *prospective* relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, 'a sufficient likelihood that [the plaintiff] will again be wronged in a similar way.'" *Marcavage*, 689 F.3d at 103 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). In other words, a plaintiff must demonstrate that the injury that is the subject of the lawsuit is "certainly impending." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Therefore, a plaintiff may not rely solely on past injuries to establish standing to assert a claim for prospective relief. *Id.* Rather, the plaintiff must show "how [the plaintiff] will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Id.*

Like individuals, organizational plaintiffs "must independently satisfy the requirements of Article III standing." *Knife Rights, Inc., v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015). Deprivations of First Amendment rights are cognizable as injuries, whether asserted by an individual or an organization. *See, e.g.*, *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 675 F. Supp. 2d 411, 425-26 (S.D.N.Y. 2009). A statute that restricts the ability of individuals to witness signatures on ballot petitions may cause an organization to sustain a First Amendment injury because "[a]n organization, as well as an individual, may suffer from the lost opportunity to express its message." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 650 (2d Cir. 1998).

The criteria for determining standing are applied less strictly where, as here, plaintiffs bring a facial challenge to a statute. Plaintiffs' complaint asserts both a facial and an as-applied challenge to the witness-residency requirement. Compl. ¶¶ 35-42. Facial challenges focus on the text of a statute itself, as opposed to its application to any particular circumstances, while as-applied challenges consider the facts of a particular case to decide whether a statute that might be

constitutional on its face was nevertheless applied in a manner that deprived a plaintiff of a protected right. *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174-75 (2d Cir. 2006). Plaintiffs do not identify in their complaint any particular circumstance in which Section 6-140(1)(b) was applied specifically to them, nor do they identify any narrow reading of the statutory text that would leave the statute intact but not infringe their First Amendment rights. Accordingly, plaintiffs' challenge is best understood as a facial one; plaintiffs argue, in essence, that any law limiting who may witness signatures on nominating petitions to duly registered New York State voters curtails their freedom of association and speech.

Facial challenges are permitted in the First Amendment context and require only that plaintiffs "demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *Lerman*, 232 F.3d at 146 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). Pre-enforcement First Amendment claims, moreover, are analyzed "under somewhat relaxed standing and ripeness rules," because the law recognizes that plaintiffs asserting pre-enforcement challenges "face an unattractive set of options if they are barred from bringing a facial challenge: refraining from activity they believe the First Amendment protects, or risk[ing] civil or criminal penalties for violating the challenged law." *NOM*, 714 F.3d at 689 (internal quotation marks and citation omitted). Mere allegations of a "subjective chill," however, are insufficient to satisfy the injury-in-fact requirement. *N.Y. Civil Liberties Union*, 675 F. Supp. 2d at 427 (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 226 (2d Cir. 2006), *abrogated on other grounds, Bond v. United States*, 564 U.S. 211 (2011)). A plaintiff in a First Amendment case instead "must demonstrate some specific present or future objective harm that the challenged regulation has inflicted by deterring

[the plaintiff] from engaging in protected activity." *Id.* (quoting *Brooklyn Legal*, 462 F.3d at 226).

Plaintiffs meet these standing requirements. Redpath argues that he has suffered an injury-in-fact and has standing because the challenged statute diminishes the value of his work as a petition circulator on behalf of candidates he supports. Because of the statute's requirements, Redpath may circulate petitions only if accompanied by a duly registered New York voter who will witness any signatures obtained. Plaintiffs' Memorandum in Support ("Pls.' Mem.") at 10-11, Docket Entry 35-2; Plaintiffs' Memorandum in Opposition ("Pls.' Opp.") at 3-5, Docket Entry 42. Redpath has submitted an affidavit stating that he volunteers his services to LPNY as a petition witness or circulator "to forge better relationships within the party and across the country." Declaration in Support of Plaintiffs' Motion for Summary Judgment by William Redpath ("Redpath Decl."), ¶ 4, Docket Entry 55-2. The chair of plaintiff LPNY has also submitted an affidavit in which he states that, "during the 2016 petitioning period, Mr. Redpath was not invited to petition, despite his expressed willingness and wish to do so, because of the unavailability of a qualified New York witness to accompany him." Third Declaration of Mark Glogowski in Support of Plaintiffs' Motion for Summary Judgment ("Third Glogowski Decl."), ¶ 2, Docket Entry 55-1. Finally, Redpath contends he has not only been harmed in the past, but also will be harmed in the future, because he plans to circulate petitions again in 2018. Redpath Dep. 43:3-19.

LPNY contends that it has standing because the requirement that witnesses be registered voters impairs its ability to coordinate the dissemination of its message with activists and professional circulators. Pls.' Mem. at 10-11; Plaintiffs' Supplemental Memorandum ("Pls.' Supp.") at 7, Docket Entry 55. In his affidavit, LPNY's chair asserts that LPNY would have

liked to employ the services of professional out-of-state petition witnesses, but did not because of the cost of also hiring an accompanying New York "witness chaperone." Third Glogowski Decl. ¶ 3. Glogowski further states that enforcement of the challenged witness-residency requirement "increases the expenses of LPNY by (1) requiring us to pay for accompanying witness chaperones for our productive nonresident professionals, and (2) requiring us to pay more for less productive New York professionals." *Id*. ¶ 5. LPNY argues that the adverse impact of the registered voter requirement on its ability to spread its political message is plain as a matter of logic and common sense, and flows directly from the challenged statute's prohibition on out-of-state circulators witnessing signatures. *Id*. ¶ 6; Pls.' Supp. at 7-8.

Generally,

> [w]hen the suit is one challenging the legality of government action . . ., the nature and extent of the facts that must be averred . . . to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . at issue. If he is, there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it.

*Lujan*, 504 U.S. at 561-62. Here, plaintiffs are the objects of the government action at issue. The challenged statute disqualifies Redpath from witnessing ballot petition signatures and prevents LPNY from employing the services of Redpath and other out-of-state circulators as efficiently as it might. Redpath could undoubtedly speak with more voters and seek more petition signatures on behalf of LPNY's candidates if he did not have to work as part of a team with a registered New York voter. Plaintiffs have presented evidence indicating that LPNY makes less use of out-of-state circulators in New York than it otherwise would because of the cost and inefficiency involved in hiring or arranging for volunteer New York "witness chaperones." Plaintiffs have also presented evidence indicating that Redpath was not invited to circulate petitions in New York in 2016 because it was too difficult to find a qualified New York

witness to accompany him. Plaintiffs have thus averred sufficient facts to establish an injury-in-fact caused by the statute's witness-residency requirement. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 314 (4th Cir. 2013) (finding that a similar witness-residency requirement burdened plaintiffs' First Amendment rights because "the witness residency requirement inevitably 'limits the number of voices who will convey [the] message and hours they can speak and, therefore, limits the size of the audience they can reach'" (quoting *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988)); *Krislov v. Rednour*, 226 F.3d 851, 857-58 (7th Cir. 2000) (finding that the challenged residency requirement injured plaintiffs because, *inter alia*, it "limit[ed] the size of the audience the candidates could reach and reduc[ed] the quantum of speech about the candidates' political views that otherwise could be generated").

Plaintiffs have also established that it is likely that their injuries will be redressed by a favorable decision in this action. If the witness-residency requirement is held to be unconstitutional, it may not be enforced, and Redpath and other persons who are not New York State residents will be permitted to witness signatures on petitions seeking to place candidates nominated by LPNY on the ballot.

Defendants argue that Redpath has not suffered any injury-in-fact because he has successfully circulated petitions for LPNY candidates in New York in the past and participated in LPNY's 2016 campaign efforts in ways other than circulating petitions in New York State. Defendants' Memorandum in Support ("Defs.' Mem.") at 9-10, Docket Entry 40 (citing Redpath Dep.); Defs.' Supp. at 4. Defendants similarly contend that LPNY has failed to establish injury-in-fact because it has successfully gained access to the ballot in many past elections. Defs.' Supp. at 6; Defendants' Supplemental Reply Memorandum of Law ("Defs.' Supp. Reply") at 6-7, Docket Entry 56.

Defendants' argument seems to rest on the premise that there is some threshold quantum of speech that satisfies the First Amendment and that it follows as a logical matter that one who is permitted to engage in a greater quantum of speech may not claim to have sustained an injury-in-fact. Defendants are mistaken. The Supreme Court has "consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000). *See also Lerman*, 232 F.3d at 152 (quoting *Jones* in a case challenging a New York Election Law provision that required witnesses to ballot-access petitions to be residents of the political subdivision where the office sought was situated). Thus, a plaintiff challenging a statute on First Amendment grounds need not demonstrate, for example, that the statute caused him to lose an election or a position on the ballot. *See Credico*, 2013 WL 3990784, at *10 ("It is not necessary for the purpose of establishing standing that plaintiffs show that [plaintiff] might have won the election or achieved a specific number of additional votes if not for the enforcement of [the challenged provision]."). Rather, an injury to First Amendment rights arises from the "restriction of . . . opportunities to communicate . . . political ideas to the voting public at large." *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 627 (2d Cir. 1989).

In *Meyer v. Grant*, the Supreme Court pointed out that any law restricting how petition circulators are chosen or compensated "limits the number of voices who will convey [petitioner's] message and the hours they can speak and, therefore, limits the size of the audience they can reach." 486 U.S. at 422-23. Although this language from *Meyer* is from a portion of the decision addressing the merits of the case, it was applied by another court to determine that the plaintiffs before it—who, like plaintiffs here, were a political party and a petition circulator—had

standing. In *Libertarian Party of Virginia v. Judd*, the court, after quoting the language from *Meyer* cited above, reasoned as follows:

> It is therefore immaterial that the LPVA [the plaintiff political party] can, in spite of the witness residency requirement, circulate its petitions to enough of the electorate to permit the collection of 10,000 signatures, if it is also true that, absent the requirement, the petition circulators could approach and attempt to persuade an even larger audience. An encumbrance thus alleged, whose presence is properly evidenced on summary judgment, constitutes an injury in fact for standing purposes.

718 F.3d at 315.

The same reasoning applies here. Redpath's ability to circulate petitions is circumscribed by the witness-residency rule, as is LPNY's ability to make the most effective use of non-resident circulators and spread its message to the widest possible audience. It is immaterial that Redpath may have the opportunity to circulate petitions in the company of a duly registered voter or that LPNY may obtain sufficient signatures for its candidates to appear on the ballot despite the witness-residency requirement. Accordingly, plaintiffs have established their standing to challenge New York Election Law Section 6-140(1)(b).

### C. The Constitutionality of the Witness-Residency Requirement

Laws that regulate elections and the electoral process "implicate rights that lie at the core of our Constitution, including the right to vote, [and] to engage in free speech and association." *Credico*, 2013 WL 3990784, at *15 (internal citation omitted). "[T]he right of individuals to associate for the advancement of political beliefs, and the right of qualified voters . . . to cast their votes effectively . . . rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). The Supreme Court has held that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (quoting *Wesberry v.*

*Sanders*, 376 U.S. 1, 17 (1964)).  That the statute challenged here is directed at independent

political bodies rather than established political parties is of particular concern, because

> [a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment.  It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties.  By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas.

*Anderson v. Celebrezze*, 460 U.S. 780, 793-94 (1983) (internal citation omitted).

Nevertheless, the Supreme Court has recognized that individual states have the authority

to regulate elections and that not every regulation runs afoul of constitutional limits.  *Burdick*,

504 U.S. at 441.  "It does not follow . . . that the right to vote in any manner and the right to

associate for political purposes through the ballot are absolute."  *Id.* at 433.  Indeed, "[c]ommon

sense, as well as constitutional law, compels the conclusion that government must play an active

role in structuring elections."  *Id.*  Regulations ensure that elections have "some sort of order,

rather than chaos."  *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Timmons v. Twin Cities

Area New Party*, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable

regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.").

While they may be necessary, "[e]lection laws will invariably impose some burden upon

individual voters" and their rights.  *Burdick*, 504 U.S. at 433.  "Each provision of a code,

'whether it governs the registration and qualifications of voters, the selection and eligibility of

candidates, or the voting process itself, inevitably affects—at least to some degree—the

individual's right to vote and his right to associate with others for political ends.'"  *Id.* (quoting

*Anderson*, 460 U.S. at 788).

The degree to which these burdens and effects are constitutionally tolerable is indirectly proportional to their severity. In other words, the constitutionality of an election regulation is judged on a sliding scale. *See Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001) ("The Supreme Court has developed a sliding standard of review to balance [burdens and states' interests].). To pass constitutional muster, statutes that impose "severe" restrictions on the exercise of First Amendment rights must "be narrowly drawn to advance a state interest of compelling importance." *Lerman,* 232 F.3d at 145 (quoting *Burdick*, 504 U.S. at 434); see *also Krislov*, 226 F.3d at 859 ("Laws imposing severe burdens must be narrowly tailored to serve compelling state interests, but lesser burdens receive less exacting scrutiny."); *Credico*, 2013 WL 3990784, at *16; *Chou v. N.Y. State Bd. of Elections*, 332 F. Supp. 2d 510, 513 (E.D.N.Y. 2004). There is no litmus-paper test for determining the severity of a regulation's burden. *Anderson*, 460 U.S. at 789. Courts must perform a particularized analysis of the degree to which a statute or regulation burdens plaintiffs in an individual case. *Lerman*, 232 F.3d at 146. That being said, restrictions on "core political speech so plainly impose a 'severe burden' that application of strict scrutiny clearly will be necessary." *Id.* (quoting *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 208 (1999) (Thomas, J., concurring)).

1. The Witness-Residency Requirement Imposes a Severe Burden.

Circulating petitions "clearly constitute[s] core political speech," because it "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Lerman*, 232 F.3d at 146 (quoting *Meyer*, 486 U.S. at 421). Accordingly, because it restricts who may witness signatures on nominating petitions, the witness-residency provision of Section 6-140(1)(b) is subject to strict scrutiny.

The statute at issue in *Lerman*, insofar as is relevant here, provided that petition signatures could be witnessed only by "resident[s] of the political subdivision in which the office or position is to be voted for." *Lerman*, 232 F.3d at 139 (quoting N.Y. Elec. Law § 6-132(2)). The court concluded that this requirement "dramatically reduced the number of potential petition circulators available to advance" the favored candidate's "political message." *Id.* at 147. *See also Chou*, 332 F. Supp. 2d at 514-15 ("By reducing the number of people available to circulate petitions and precluding candidates from using witnesses of their choosing, the statute infringes on candidates' ability to disseminate their message and promote their political views, an ability intimately connected with their right of political association."). The Second Circuit went on to hold that the requirement of residency in the relevant political subdivision imposed a "severe burden" even though it did not expressly prohibit non-residents from circulating petitions or from working together or associating with residents who were authorized by the statute to witness signatures. The court reasoned that, by preventing the plaintiffs "from using signatures gathered by [non-resident] circulators . . . , the law inhibits the expressive utility of associating with individuals because these potential circulators cannot invite voters to sign the candidates' petitions in an effort to gain ballot access." *Lerman*, 232 F.3d at 147 (quoting *Krislov*, 226 F.3d at 861). Accordingly, the court in *Lerman* applied strict scrutiny to the political subdivision residency requirement imposed by the statute challenged in that case.

The statute at issue in *Lerman* differs from the one challenged here only with respect to the geographical scope of the residency requirement imposed: the statute in *Lerman* required that petition signatures be witnessed by voters within the relevant political subdivision, whereas the statute at issue here requires that witnesses be duly registered voters and residents of the State of New York. Although the Court in *Lerman* explicitly declined to decide whether a state-wide

residency requirement would trigger strict scrutiny, 232 F.3d at 150 n.14, several other courts have considered such requirements and concluded that strict scrutiny should be applied to them. Indeed, "a consensus has emerged that petitioning restrictions like the one at issue here [requiring that witnesses to petition signatures be state residents] are subject to strict scrutiny analysis. . . . Residency restrictions bearing on petition circulators and witnesses burden First Amendment rights in a sufficiently severe fashion to merit the closest examination." *Libertarian Party of Va.*, 718 F.3d at 316-17 (citing cases); *see also Wilmoth v. Secretary of N.J.*, _ Fed. App'x. _, 2018 WL 1876021, at *3-4 (3d Cir. Apr. 19, 2018) (applying strict scrutiny to a statute requiring petition circulators to be in-state residents for the signatures they collect to be counted); *Yes on Term Limits v. Savage*, 550 F.3d 1023, 1025, 1028 (10th Cir. 2008) (same); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008) (same); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (same); *Krislov*, 226 F.3d at 862 (same); *Libertarian Party of Conn.v. Merrill*, 2016 WL 10405920, at *6 (D. Conn. Jan. 26, 2016) (same); *Citizens in Charge v. Gale*, 810 F. Supp. 2d 916, 924-25 (D. Neb. 2011) (same). *But see Jaeger*, 241 F.3d at 616-17 (finding that a residency requirement did not "unduly restrict speech" and therefore was not unconstitutional).

Defendants attempt to distinguish these cases on the ground that they concern statutes limiting who may circulate petitions, whereas the New York statute challenged in this case restricts only who may witness petition signatures and in no way regulates who may advocate for a candidate or solicit voters to sign petitions. Defendants are correct that the cases cited above generally speak in terms of petition circulators rather than witnesses to petition signatures. A close examination of the statutes challenged in those cases, though, reveals that those statutes, like the one challenged here, in fact regulate who may serve as a witness to a petition signature and do not preclude non-residents from advocating for candidates, political parties, or ballot

initiatives. *See Libertarian Party of Va.*, 718 F.3d at 316-19 (holding unconstitutional Va. Code § 24.2-543, which provides in relevant part that nominating petitions "shall be witnessed by . . . a person who is a resident of the Commonwealth"); *see also Wilmoth,* 2018 WL 1876021, at *3-4 (applying strict scrutiny to New Jersey's circulation statute, N.J. Stat. Ann. § 19:23-11, which reads in relevant part that nominating petitions "shall be verified by the oath or affirmation . . . of the person who circulates each petition . . .[,] that the affiant personally circulated the petition . . . that the signers are to the best knowledge and belief of the affiant legal voters of the State [and that the] person who circulates the petition shall be a registered voter" in the state); *Savage*, 550 F.3d at 1025, 1028-31 (finding unconstitutional Okla. Stat. Ann. tit. 34 § 6, which required petition signatures to be verified by "the person who circulated said sheet of said petition" and that the person be a qualified elector of Oklahoma); *Blackwell*, 545 F.3d at 464, 467 n.2, 477-78 (finding unconstitutional Ohio Rev. Code Ann. § 3503.06, which stated that "[n]o person shall be entitled . . . to sign or circulate any declaration of candidacy or any nominating, initiative, referendum, or recall petition, unless the person is registered as an elector and will have resided in the county and precinct where the person is registered for at least thirty days at the time of the next election," and citing Ohio Rev. Code Ann. § 3501.38(E)(1), which required that circulators "witness[] the affixing of every signature"); *Brewer*, 531 F.3d at 1036-38 (finding unconstitutional Ariz. Rev. Stat. Ann. § 16-321(D), which required in relevant part that "[t]he person before whom the signatures were written on the signature sheet shall be qualified to register to vote in this state . . . and shall verify that each of the names on the petition was signed in his presence on the date indicated"); *Krislov*, 226 F.3d at 862, 866 (holding unconstitutional 10 Ill. Comp. Stat. Ann. 5/7-10, which required the circulator to attest that he or she "reside[s] . . . in . . . [the] State of Illinois, and that the signatures on [the] sheet were signed

in [his or her] presence"); *Libertarian Party of Conn.*, 2016 WL 10405920, at *6-7 (finding as likely unconstitutional Conn. Gen. Stat. Ann. § 9-453j, which requires each nominating petition to "contain a statement as to the residency in [the] state and eligibility of the circulator and authenticity of the signatures thereon. . . . [Each statement must also contain the] circulator's residence address, including the town in this state in which such circulator is a resident . . . [and] that each person whose name appears on [the] page signed the same in person in the presence of such circulator"); *Citizens in Charge*, 810 F. Supp. 2d at 918, 924-25 (declaring unconstitutional Neb. Rev. Stat. Ann. § 32-629(2), which stated in relevant pat that "only an elector of the State of Nebraska may qualify as a valid circulator of a petition and may circulate petitions" and noting that Neb. Rev. Stat. Ann. § 32-630(2) required that "[e]ach circulator of a petition shall personally witness the signatures on the petition and shall sign the circulator's affidavit").[5] Accordingly, defendants' attempt to distinguish these cases fails.

For all these reasons, while the statute at issue here is less restrictive than the one considered in *Lerman*, it too limits "core political speech" and imposes a "severe burden" on plaintiffs' exercise of their First Amendment rights. Accordingly, the statute is subject to "exacting scrutiny."

2. The Witness-Residency Requirement is not Narrowly Tailored and is Therefore Unconstitutional.

Because the witness-residency requirement imposes a "severe burden" on plaintiffs' First Amendment rights, it must be narrowly tailored to advance a compelling state interest to be constitutional. *See, e.g.*, *Lerman*, 232 F.3d at 149. Defendants argue that the witness-residency requirement is designed to protect the integrity of the petition process and guard against frivolous

---

[5] The quoted statutory language reflects the text of the various statutes at the time they were challenged; the current versions of the statutes are, for the most part, different.

or fraudulent candidacies. Defs.' Mem. at 18. Courts have held that "ensuring integrity and preventing fraud in the electoral process" are, in fact, compelling state interests. *Lerman*, 232 F.3d at 149; *see also Chou*, 332 F. Supp. 2d at 516. Plaintiffs have acknowledged as much. Pls.' Mem. at 16. Thus, the crucial question is whether the witness-residency requirement is narrowly tailored to serve these interests.

Defendants argue that the witness-residency requirement is narrowly tailored because duly registered voters, unlike non-residents, may be quickly reached and called upon to testify in the event that petition signatures they witnessed are challenged. Defendants point out that registered voters, as residents of the State, are subject to the State's subpoena power and may therefore be compelled to appear and to testify. Defs.' Mem. at 17-19. Defendants also emphasize that speed is of the essence when petitions are challenged, because the statute of limitations for challenging a petition is a mere two weeks after the last day a petition may be filed and because there are short, tight deadlines by which ballots must be certified and printed. Declaration of Robert Brehm ("Brehm Decl.") ¶¶ 10-11, Docket Entry 54; *see also* 52 U.S.C. § 20302; N.Y. Elec. Law § 16-102(2). Accordingly, the entire process of litigating a petition challenge is typically completed in approximately three weeks. Brehm Decl. ¶ 10.

Defendants contend that, without the witness-residency requirement, petition challengers would be at a disadvantage because they bear the burden of proof on invalidity and because petition signatures are presumed to be valid. *Id.* ¶¶ 8-10, 22. More specifically, defendants argue that "[t]he witness requirement assists petition challengers to find and produce witnesses within the required timeframe by providing the voter's name, address and an exemplar of his or her signature. . . . Once located through voter registrations rolls, New York witnesses may be subpoenaed into court, or to the Board. . . . [O]ut-of-state witnesses would generally not be

subject to the subpoena power of New York courts." Defs. Mem. at 19. Defendants argue that permitting non-residents beyond the subpoena power of New York courts to witness petition signatures would chill challengers from contesting the validity of nominating petitions because of the obstacles and expense involved in compelling the attendance of witnesses from out of state. *Id.*

Plaintiffs respond that the state's legitimate interest in promptly securing the testimony of those who witness petition signatures could be satisfied by more narrowly tailored requirements, such as a statute providing that nonresident witnesses must consent in advance to the State's subpoena power. Pls.' Opp. at 9-11. Plaintiffs point out that Arizona has enacted such a statute. *Id.* In Arizona, nonresident circulators must register with the Secretary of State. Az. Rev. Stat. Ann. § 19-118(A). Political parties are responsible for collecting their circulators' registrations and delivering them to the Secretary. *Id.* As part of their registration, circulators consent to the State's subpoena power and provide an address where they may be served. *Id.* § 19-118(B)(1)-(2). If a circulator fails to appear after being properly served, signatures collected by that circulator are deemed invalid. *Id.* § 19-118(C).

Several courts have concluded that procedures like those set forth in the Arizona statute provide a less restrictive means than witness-residency rules for addressing a state's legitimate concerns and have accordingly struck down witness-residency requirements. "Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result." *Brewer*, 531 F.3d at 1037; *see also Wilmoth*, 2018 WL 1876021, at *5: *Libertarian Party of Va.*, 718 F.3d at 318; *Savage*, 550 F.3d at 1029-30; *Krislov*, 226 F.3d at 866 n.7; *Libertarian Party of*

*Conn.*, 2016 WL10405920, at *7; *Citizens in Charge*, 810 F. Supp. 2d at 926-27. The efficacy of a system of registration and consent to the state's subpoena power is also suggested by an alternative means of qualifying to witness signatures already provided by New York law. New York Election Law Section 6-140(2) allows notaries public to witness petitions. In New York, a notary public must either reside in New York State or have an office or place of business here. N.Y. Exec. Law § 130(1). Nonresident notaries public appoint the Secretary of State to accept service of process on their behalf. *Id.* Thus, New York law already permits certain nonresidents who agree to accept service of process to witness petition signatures.

In *Buckley*, the Supreme Court examined a Colorado statute that, like the New York law challenged here, required that initiative-petition circulators be registered to vote in the state. Colorado argued that its voter registration requirement ensured that circulators would be amenable to the State's subpoena power. 525 U.S. at 196. Though it did not consider the constitutionality of Colorado's residency requirement, the Court did hold that requiring circulators to be registered voters imposed an unjustifiably severe limitation on protected speech. *Id*. at 196-97. The Court concluded that requiring circulators to submit affidavits including their address was a more narrowly tailored means of meeting Colorado's compelling interests than requiring that circulators be registered voters; in the Court's view, an address attestation has "an immediacy, and corresponding reliability, that a voter's registration may lack." *Id*. at 196.

To the extent defendants argue that *Buckley*, like the other cases cited above, concerned a requirement imposed on all petition circulators and not only on those who witness signatures, they are mistaken. The Supreme Court in *Buckley* held unconstitutional the voter registration requirements imposed by Colo. Rev. Stat. Ann. § 1-40-112(1), which at the time of the decision stated that "[n]o section of a petition for any initiative or referendum measure shall be circulated

by any person who is not a registered elector," and Colo. Rev. Stat. Ann. § 1-40-111(2), which required that "[t]o each petition section shall be attached a signed . . . affidavit executed by the registered elector who circulated the petition section, which shall include the address at which he or she resides . . . that he or she was a registered elector at the time the section of the petition was circulated and signed by the listed electors; that he or she circulated the section of the petition [and] that each signature thereon was affixed in the circulator's presence." 525 U.S. 182, 186, 188 n.2, 189 n.7. *Buckley* thus virtually mandates the conclusion that at least the "duly registered voter" requirement of Section 6-140(b)(1) is unconstitutional.

Finally, the State's interest in the integrity of the petition process is served by statutory provisions that criminalize misconduct in connection with petitioning, and in particular the witnessing of petition signatures. These provisions render it a misdemeanor to pay for signatures or to alter or make a false statement on a petition. N.Y. Elec. Law § 17-122(4), (7)-(8). "These provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition . . . ." *Meyer*, 486 U.S. at 427.

Defendants offer little if any reason not to apply *Buckley* and the various circuit and district court authorities cited above here. Defendants do not, for example, point to instances of fraud or abuse that were prevented by the witness-residency requirement of Section 6-140(1)(b) but would not have been by a requirement that out-of-state circulators register and consent to New York's subpoena power. Nor do they point to the failure of registration and consent provisions adopted in other states to preserve the integrity of the petition process.

Defendants do rely on *Lerman*, where the Second Circuit, in striking down a residency requirement for political subdivisions, noted that a state-wide limitation would be "less burdensome." *Lerman*, 232 F.3d at 150. The Court went on, however, to state explicitly that it

was not deciding the constitutionality of any requirement that petition witnesses be residents of New York State. 232 F.3d at 150 n.14. Defendants rely as well on *Germalic v. Comm'rs of the Bd. of Elections*, 2011 WL 1303644 (N.D.N.Y. Apr. 1, 2011), *aff'd on other grounds*, 466 Fed. App'x 54 (2d Cir. 2012). The court in *Germalic* applied strict scrutiny to the witness-residency requirement and found that it was narrowly tailored to serve compelling state interests and therefore constitutional. *Id.* at *2-3. Crucially, however, the court first found that the plaintiff did not have standing to challenge the provision. *Id.* at * 2. Accordingly, the court lacked jurisdiction to decide the merits of plaintiff's claim, and its conclusion that the challenged statute is constitutional is *dicta. See, e.g., John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 735 (2d Cir. 2017) ("[W]ithout jurisdiction the district court lacks the power to adjudicate the merits of a case." (internal quotation marks and citation omitted)); *Penguin Books USA Inc. v. Walsh*, 929 F.2d 69, 72 (2d Cir. 1991) ("A federal court lacks the power to render advisory opinions and the authority 'to decide questions that cannot affect the rights of litigants in the case before them.'" (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). In any event, to the extent *Germalic* holds that Section 6-140(b) is constitutional, its decision is not binding on this court and, for the reasons stated above, I respectfully decline to follow it.

For all the reasons stated above, including those articulated by the majority of courts that have considered the question, I conclude that a requirement that petition signature witnesses from out-of-state register and submit to the subpoena power of New York State provides a means of serving New York State's compelling interests that is more narrowly tailored than the witness-residency requirement. "[N]onresidents with a stake in having the signatures they witnessed duly counted and credited . . . will possess the same incentive as their resident counterparts to appear." *Libertarian Party of Va.*, 718 F.3d at 318. I therefore hold that the witness-residency

requirement in New York Election Law Section 6-140(1)(b) unconstitutionally infringes upon plaintiffs' First Amendment rights.

## CONCLUSION

Having found that the witness-residency requirement in section 6-140(1)(b) is not narrowly tailored and is unconstitutional, plaintiffs' motion for summary judgment is granted and defendants' motion for summary judgment is denied. Counsel shall attempt to agree on the terms of a declaratory judgment and permanent injunction consistent with this opinion, with defendants of course reserving their right to appeal, and shall submit their proposal to the Court by Friday, May 25, 2018.

SO ORDERED.

_____/s/_____
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
May 18, 2018

U:\#VAR 201p

7-2018\Merced Et Al V. Spano Et Al. 16-CV-3054\Merced V Spano_16cv3054_FINAL.Docx\